IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES D. LARSON, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MOTOR WERKS OF )<br>BARRINGTON, INC., )<br>)<br>Defendant. )<br>) | No. 15 C 5572<br><br>Magistrate Judge<br>Maria Valdez |

## MEMORANDUM OPINION AND ORDER

Plaintiff's complaint against his former employer Defendant Motor Werks of Barrington, Inc. ("Motor Werks") alleges: (1) Count I – Disability Discrimination in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*; (2) Count II – Age Discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*; (3) Count III – Family and Medical Leave Interference in violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2611 *et seq.*; and (4) Count IV – Family and Medical Leave Retaliatoin in violation of FMLA. This matter is now before the Court on Defendant's Motion for Summary Judgment on all four counts [Doc. No. 39, 51]. For the reasons that follow, the motion is granted.

1

# FACTS[1]

Defendant Motor Werks and its affiliate Land Rover Sales and Service of Hoffman Estates ("Land Rover") are automobile dealerships that sell and service new and used vehicles. At all relevant times, Larson was either a prospective employee or employee of Motor Werks. (LR 56.1(a)(3) ¶ 3.) Larson had significant experience since the 1980s in selling luxury automobiles. (LR 56.1(b)(3)(C) ¶ 2.)[2] On September 30, 2011, Larson completed an employment application and interviewed for a sales position at Land Rover. He had previously worked for the company in the 1990s. (LR 56.1(a)(3) ¶¶ 4, 9.) Larson affirmatively stated on the employment application that he could perform the essential functions of the position for which he was applying. (*Id.* ¶ 6.) Larson was hired for the position and began working at Land Rover on October 10, 2011. At the time he was hired in 2011, Larson was nearly 72 1/2 years old. (*Id.* ¶¶ 7-8.)

When he was interviewed and hired by Land Rover, Larson had an indwelling prosthesis of the esophagus, also known as a voice prosthesis; it was

---

[1] Unless otherwise noted, the following material facts are undisputed or are deemed admitted due to a party's failure to comply with Local Rule 56.1, which this Court strictly enforces.

[2] Plaintiff's statement of facts cites liberally to his verified complaint under the premise that "a verified complaint is not just a pleading; it is also the equivalent of an affidavit for purposes of summary judgment." *Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017). Defendant has moved to strike Plaintiff's footnote citing to *Beal* and other paragraphs on the basis that they set forth legal conclusions of law, are vague, or amount to hearsay. The Court is well aware of its obligations under Federal Rule of Civil Procedure ("Rule") 56 and Local Rule 56.1, and only statements supported by competent facts will be considered. For example, a statement included in an affidavit will not be taken as true if it is not a fact within the affiant's personal knowledge. Defendant's Motion to Strike Plaintiff's Rule 56.1(b)(3) Statement of Additional Facts [Doc. No. 48] is therefore denied as moot.

clearly apparent to the casual listener, including Defendant's employees. The prosthesis did not prevent him from performing the essential functions of his job. (*Id.* ¶¶ 10-11.) Larson's statement of facts describes himself as both "one of defendant's best salesmen" and "about as good as anybody else" in terms of sales. His testimony reveals that he would rank himself "probably in the middle"; a trainer's deposition to which he cites describes him as "extremely good with people and building relationships" with "average" sales; and a fellow salesman testified that Larson "was as good as anybody else that was there." (LR 56.1(b)(3)(C) ¶ 5.)

After he was hired, Larson received a new employee handbook, which he acknowledges receiving, reading, executing, and understanding. The handbook lists Defendant's policies and procedures, including a code of conduct that prohibited "insubordinate conduct, including, but not limited to refusing to follow instructions." Plaintiff acknowledged that a violation of the code of conduct or "any . . . rules will result in discipline, up to and including termination." (LR 56.1(a)(3) ¶¶ 13, 15-16.) Larson knew from his experience working in the automobile sales industry the importance of profit, how dealerships are run, adhering to the corporate hierarchy, and avoiding insubordination. (*Id.* ¶ 17.) Although he was required to sell as many automobiles as possible, he was also required to follow directions and the established chain of command. (*Id.* ¶ 18.) Larson was aware that the automobile sales industry is a tough business with a lot of turnover. He was aware of a few sales managers and finance managers who had been terminated work with their employment with Motor Werks during the time of his employment there. (*Id.* ¶ 23.)

After being hired, Larson was told that Land Rover had a specific geographic sales region. (*Id.* ¶ 20.)

Around January 18, 2013, Larson was unexpectedly hospitalized four days for testing related to a heart condition called atrial fibrillation. (*Id.* ¶ 41; LR 56.1(b)(3)(C) ¶¶ 10-11.) When Defendant became aware that Larson was hospitalized, John Nelson, his sales manager, told him not to worry about it, to get better, and come back to work whenever he was ready. (LR 56.1(a)(3) ¶¶ 55-56.) Larson returned to work on January 25, 2013. (LR 56.1(b)(3)(C) ¶ 14.) According to Larson, he did not know if the atrial fibrillation would impair his ability to perform any employment-related activities, and he did not know what sort of reasonable accommodation he would require, if any. (LR 56.1(a)(3) ¶ 45.) Larson advised Nelson that his heart was not beating right, that he would get tired, that he might need something, and that he may be unable to work twelve-hour days any longer. (*Id.* ¶ 46; LR 56.1(b)(3)(C) ¶ 15.) Nelson responded, "Do what you need to do Jimmy. Just let me know." (LR 56.1(a)(3) ¶ 46.) Since his employment ended with Defendant, Larson has undergone repeat hospital visits and heart therapy. (LR 56.1(b)(3)(C) ¶ 13.)

On January 23, 2013, two days before Larson returned to work, Nelson sent an email to all Land Rover salesmen advising them that Land Rover would be receiving a new 2013 Range Rover Supercharged vehicle ("RR S/C"). Having a RR S/C available for sale was a rare occurrence; the car was so rare and sought after that Land Rover refused to give any customer discount on the price. (LR 56.1(a)(3) ¶

4

32.) Nelson's email stated: "The following car [the RR S/C] should be here before the end of the month. Let's sell it to someone local!" (*Id.* ¶ 25.) In the world of auto dealerships, the term "local" means a customer who resides in a dealer's geographic sales region, or "marketplace," as defined by the automobile manufacturer. (*Id.* ¶ 27.) According to Nelson's testimony, the indication that the vehicle was to be sold to a local customer was also mentioned in meetings within the dealership and other discussions. Nelson stated that it was generally known that this and other Land Rover vehicles should not be sold outside of the local area because the dealership would suffer a financial penalty. (*Id.* ¶¶ 28-31.)

Larson alleges that he never received Nelson's email, but he acknowledges that he was responsible for checking his emails. (*Id.* ¶ 22; LR 56.1(b)(3)(C) ¶ 29.) Larson also disputes Defendant's assertion that a dealer that sold vehicles outside of its geographic sales region "lost money," but he admits that the dealer would stand to obtain a smaller profit. (LR 56.1(b)(3)(B) ¶ 35.) Larson was aware that Land Rover wanted the RR S/C to be sold to someone within the manufacturer's designated geographic sales region and that the initial instruction for the sale was that it was to be sold to someone local in Land Rover's sales marketplace. (LR 56.1(a)(3) ¶ 33.)

At some point shortly after he returned to work at the end of January 2013, Larson sold the RR S/C to a customer from downstate Illinois, which is outside of Land Rover's geographic sales region. As a result of the out-of-region sale, Defendant lost approximately $3000 in manufacturer payments it would have

received had it been sold within the local marketplace. (*Id.* ¶¶ 34, 36; LR 56.1(b)(3)(C) ¶ 36.) The transaction was approved by another sales manager, John Kyriakopoulos, but when Nelson learned that the vehicle had been sold to a downstate customer, he tried unsuccessfully to renegotiate the price or cancel the sale. (LR 56.1(a) ¶ 24.) Nelson believed that Larson had given Kyriakopoulos false information about whether the customer was within the local area. (*Id.* ¶ 32.) After the sale, on or about January 31, 2013, Larson's employment was terminated. (LR 56.1(a)(3) ¶ 37; LR 56.1(b)(3)(C) ¶ 27.) Larson was not asked by management whether he would be willing to reduce his commission to make up for the reduced profit. (LR 56.1(b)(3)(C) ¶ 37.) The only reason Larson was given for the firing was that "we're going in a different direction" or that Defendant was an "at-will employer." (*Id.* ¶ 28.) Prior to his termination, Larson received no criticisms, write-ups, or discipline. (*Id.* ¶ 25.) Defendant does not know whether its salesmen sold any other vehicles outside the local geographic area. (*Id.* ¶ 35.)

No one who worked at Land Rover ever said anything to Larson to suggest that he should not be working there as a result of his indwelling prosthesis. The only types of comments made, according to Larson's testimony, were "kind of like speak up or so on and so forth" and that his "voice sounds funny." (LR 56.1(a)(3) ¶ 43; LR 56.1(b)(3)(C) ¶ 8.) Larson never requested time off from work as a result of his indwelling prosthesis. (LR 56.1(a)(3) ¶ 44.)

Other than his time in the hospital, Larson "didn't really request any" time off from work due to this or any other medical condition. (LR 56.1(a)(3) ¶¶ 50-51.)

He always tried to schedule his medical appointments on his days off from work. (LR 56.1(a)(3) ¶ 54.) He testified that he "never got a chance to test" whether he would have been allowed any time off. (LR 56.1(a)(3) ¶ 53.) Larson did not request any FMLA leave at any time, including after his hospitalization. He testified, "I didn't know what I would be needing. It would have been hard for me to say what I wanted." (LR 56.1(a)(3) ¶¶ 52, 58.) Larson also stated that he did not know whether or not he would need any time off in the future as a result of his atrial fibrillation. (LR 56.1(a)(3) ¶ 59.) The parties have stipulated that on the date Larson's employment was terminated, nothing in his medical records indicated or suggested that he would or would not need to take any future time off from work due to his atrial fibrillation. (LR 56.1(a)(3) ¶ 60.) No one from Motor Werks ever gave Larson the idea that he was terminated in retaliation for taking time off due to his medical condition. (LR 56.1(a)(3) ¶ 63.)

Larson alleges that during his employment, Defendant's General Manager Mick Austin made ongoing comments such as, "If you weren't so damn old, I'd fire you," and questioned whether he was too old to drive. Two other former employees of Defendant testified that Austin and Nelson stated in meetings that the Land Rover salesmen were too old and/or they wanted to hire younger employees. (LR 56.1(a)(3) ¶ 65; LR 56.1(b)(3)(C) ¶ 18.) Around the time Larson was fired, four other "older" employees of unspecified age were among the number of people who were terminated by Defendant. (LR 56.1(b)(3)(C) ¶ 22.) Around the relevant time period, Austin said at a sister dealership that they needed to get rid of the older employees

7

making top commission and bring in younger guys with less experience for less pay, even offering finder's fees to get younger employees to work at that dealership. (LR 56.1(b)(3)(C) ¶ 23.)

## DISCUSSION

I.   **LEGAL STANDARD**[3]

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must draw all reasonable inferences in favor of the nonmovant. *Bennington v. Caterpillar Inc.,* 275 F.3d 654, 658 (7th Cir. 2001).

However, once the movant has carried its burden under Rule 56(c), "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The party opposing summary judgment must offer admissible evidence in support of his version of events, and hearsay evidence does not create a genuine issue of material fact. *McKenzie v. Ill. Dep't of Transp.,* 92 F.3d 473, 484 (7th Cir. 1996); *see Larimer v. Dayton Hudson Corp.*, 137 F.3d 497, 500 (7th Cir. 1998) ("'If the non-moving party bears the burden of proof on an issue, . . . that

---

[3] Plaintiff's responsive brief suggests that "the proper analysis" of the motion is whether a jury verdict on the evidence could be overturned on a motion for judgment as a matter of law under Rule 50(a). (Pl.'s Br. at 6.) Although the Supreme Court has stated that the two standards "mirror[ ]" each other, *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000), the Court declines the invitation to analyze the motion for summary judgment under any standard other than Rule 56.

party may not rest on the pleadings and must instead show that there is a genuine issue of material fact.'") (citation omitted). "The mere existence of an alleged factual dispute is not sufficient to defeat a summary judgment motion. . . . The nonmovant will successfully oppose summary judgment only when it presents 'definite, competent evidence to rebut the motion.'" *Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002) (citations omitted); *see also Hall v. Bodine Elec. Co.,* 276 F.3d 345, 354 (7th Cir. 2002) ("Conclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact.").

"In considering a motion for summary judgment, this court is not required to scour the record in search of evidence to defeat the motion; the nonmoving party must identify with reasonable particularity the evidence upon which the party relies." *Pleniceanu v. Brown Printing Co.*, No. 05 C 5675, 2007 WL 781726, at *7 (N.D. Ill. Mar. 12, 2007) (citing *Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 898 (7th Cir. 2003)); *see Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005). Finally, the Court is "'not required to draw every conceivable inference from the record.'" *McCoy v. Harrison,* 341 F.3d 600, 604 (7th Cir. 2003) (citation omitted).

## II. ANALYSIS

Motor Werks moves for summary judgment on all claims, ADA disability discrimination, ADEA discrimination, FMLA interference, and FMLA retaliation.

A.  **ADA**

Larson's complaint alleges that Motor Werks fired him and/or refused to accommodate his medical condition on the basis of his disability and/or perceived disability, in violation of the ADA. The ADA prohibits an employer from discriminating against "a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Motor Werks contends that there is no evidence in the record that it failed to accommodate Larson's medical condition or discriminated against him on the basis of any actual or perceived disability.

1.  *Failure to Accommodate*[4]

Defendant disputes that Plaintiff asked for or required any accommodations for his disabilities. ADA discrimination can include failing to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless "the accommodation would impose an undue hardship" on the employer. 42 U.S.C. § 12112(b)(5)(A). Reasonable accommodations may include "making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and job restructuring [or] part-time or modified work schedules." 42 U.S.C. § 12111(9). Although an employer

---

[4] Plaintiff's responsive brief denies that he claims failure to accommodate, calling Defendant's argument "a red herring that misconstrues Mr. Larson's claim, which is that he was fired, not that he wasn't accommodated." (Pl.'s Br. at 13.) The complaint, however, expressly claims Defendant discriminated against him "by firing Mr. Larson and/or by refusing to accommodate his medical condition" on the basis of his disability. (Compl. ¶ 45.) Accordingly, the Court will address the failure to accommodate claim.

"is not required to provide the particular accommodation that an employee requests, . . . the employer is obliged to provide an accommodation that effectively accommodates the disabled employee's limitations." *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 802 (7th Cir. 2005) (citation and internal quotation omitted).

It is Larson's burden to demonstrate that Motor Werks was aware of his disability and need for an accommodation. *Id.* at 803 ("[T]he standard rule is that a plaintiff must normally request an accommodation before liability under the ADA attaches.") (citation and internal quotation omitted). "The ADA does not require an employer to assume that an employee with a disability suffers from a limitation. In fact, better public policy dictates the opposite presumption: that disabled employees are not limited in their abilities to adequately perform their jobs." *Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 494 (7th Cir. 2014) (citation and internal quotation omitted) ("[A] reasonable accommodation is connected to what the *employer knows* about the *specific limitations* affecting an employee who is a qualified individual with a disability.") (emphasis in original). Larson also must show that any requested accommodation was "reasonable on its face" and the request must identify the disability-related limitation it is intended to alleviate. *See id.* at 493.

After an accommodation is requested, the employer and employee are to engage in an "interactive process" to determine what reasonable measures can be taken to accommodate the disability. *Sears, Roebuck*, 417 F.3d at 804. If the nature or extent of the desired accommodation is ambiguous, "the employer must ask for

clarification." *Id.* (finding an employer had notice of the need for an accommodation when the employee provided two physician notes recommending she be allowed to avoid walking long distances). There is no evidence in the record that Larson ever notified Motor Werks of the actual or potential need for an accommodation for either of his disabilities, and therefore summary judgment is warranted to the extent Larson claims discrimination based on a failure to accommodate.

### 2. *Discriminatory Discharge*

The governing legal standard for Larson's claim of discriminatory discharge is whether the evidence as a whole would allow a reasonable factfinder to conclude that his disability caused him to be terminated. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) (clarifying that it is improper to analyze disparate treatment cases under separate "direct" and "indirect" methods of proof). *Ortiz*, however, did not dispense with the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ortiz*, 834 F.3d at 766. Accordingly, to establish a prima facie case of discrimination, Larson must show: (1) he was a qualified individual with a disability, as defined by the ADA; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated non-disabled employees were treated more favorably. *See Taylor-Novotny*, 772 F.3d at 489.

Once a plaintiff makes out a prima facie case of discrimination, the burden then shifts to the defendant to produce "a legitimate, noninvidious reason for its actions." *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 635 (7th Cir. 2009). If the

12

defendant is able to provide a reason rebutting the presumption of discrimination, the burden shifts back to the plaintiff to demonstrate that the proffered reasons "are false and only a pretext for discrimination." *Id.* (internal quotation and citation omitted).

It is undisputed that Larson was a qualified individual with a disability and that he suffered an adverse employment action. Therefore, the only issues to be decided are whether Larson met his employer's legitimate expectations and whether he was treated less favorably than similarly situated employees.

It is unnecessary for the Court to determine whether Larson was meeting Motor Werks' legitimate expectations, because fatally for Larson, he has offered no evidence that similarly situated employees were treated more favorably than he was. When offering another employee as similarly situated, "'a plaintiff must demonstrate that there is someone who is directly comparable to him in all material respects.'" *Taylor-Novotny*, 772 F.3d at 492 (quoting *Grayson v. O'Neill*, 308 F.3d 808, 819 (7th Cir. 2002)). Similarly situated employees should have the same or comparable job title, education, experience, and seniority; perform the same types of tasks; be subordinate to the same supervisor; and have a "'comparable set of failings.'" *Id.* (quoting *Burks v. Wisc. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006)); *see Cracco*, 559 F.3d at 635; *see also Brady v. Boehringer Ingelheim Pharms., Inc.*, No. 05 C 5934, 2008 WL 4425445, at *7 (N.D. Ill. Sept. 26, 2008) (holding that plaintiff's failure to offer comparators with the same performance problems "doom[ed]" her discrimination claim).

Even where a plaintiff can point to no other employees who have been terminated for the same reasons, "he is not relieved of the responsibility to point to a similarly situated individual." *Cracco*, 559 F.3d at 635. Although Larson generally argues that other vehicles have been sold outside the local region, he offers no specifics about which employees sold those vehicles, what vehicles may have been sold, or whether any of those sales were accompanied by an email stating Defendant's express desire that they be sold locally. Accordingly, Larson has failed to establish a prima facie case of discrimination.

Having found that Larson has failed to establish a prima facie case of discrimination, the Court must now "assess cumulatively all the evidence presented by [Plaintiff] to determine whether it permits a reasonable factfinder to determine" that his termination was attributable to his disability. *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017). Larson asserts that he was a good performer and received praise for his work before his hospitalization, and that a reasonable jury could infer based on his testimony that because he was fired shortly after telling Nelson his heart was not beating right, he would get tired, and he was not sure he could work full days any longer, he was terminated as a result of his atrial fibrillation. First of all, "suspicious timing must be evaluated in the context of the whole record. . . . Standing alone, it rarely is sufficient to create a triable issue." *Taylor-Novotny*, 772 F.3d at 495-96 (citation and internal quotation omitted). The timing of the firing in this case is not suspicious by itself, because the sale for which Larson was allegedly terminated occurred within a few days after he

returned to work following his hospitalization. Furthermore, Plaintiff admits that Nelson was supportive throughout his hospitalization, telling him to get better and get back to work soon. Larson points to no other fact even suggesting that Nelson harbored any animus toward him as a result of his atrial fibrillation or any other actual or perceived disability.

Finally, even assuming Plaintiff had made a prima facie case of discriminatory termination, Defendant has offered a legitimate non-pretextual reason for the employment decision, namely the sale of the RR S/C outside the local area. Larson knew his employer wanted it sold locally, but he sold it to a distant buyer anyway. Larson contends that the sale was approved by another sales manager, Kyriakopoulos, but that does not make the reason for his termination pretextual. There is no evidence contradicting the fact that Nelson, who terminated Larson, did not approve the sale and believed that Larson provided Kyriakopoulos with false information suggesting that the buyer was within the local area. Whether or not Nelson's belief was correct or his response to it was reasonable is immaterial. "An inquiry into pretext requires that we evaluate the honesty of the employer's explanation, rather than its validity or reasonableness . . ." *Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013); *see also Brown v. Ill. Dep't of Natural Res.*, 499 F.3d 675, 684 (7th Cir. 2007) (explaining that a plaintiff's own opinions about his work performance are insufficient to cast doubt on the legitimacy of his employer's stated reasons for an adverse employment action); *Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 435 (7th Cir. 2005) ("[T]he court is not a 'super-personnel department'

intervening whenever an employee feels he is being treated unjustly."). Larson has simply offered no facts suggesting that the stated reason for his firing was pretextual, rather than ill-advised or unfair. Summary judgment must therefore be granted on Larson's ADA discharge claim.

B. **Age Discrimination in Employment Act**

Defendant argues that summary judgment should be granted on Plaintiff's ADEA claim because by selling the RR S/C outside the local area, he was not performing the job according to the employer's legitimate expectations, and he has not shown any similarly situated employees were treated more favorably. As discussed above with respect to Larson's ADA claim, he has offered any comparators who were treated more favorably, and thus fails to establish a prima facie case of discrimination.

Plaintiff contends that the cumulative evidence would allow a reasonable trier of fact to infer that his termination was based upon Defendant's discriminatory animus against him based upon his age. Plaintiff points to Austin's comments about his age, Austin's and Nelson's statements that they wanted to hire younger employees, and Austin's desire to bring in younger employees for less pay at a sister dealership.

First, even if Austin's statements about a different dealer's employees were relevant to Larson's claim, his intent to replace older workers with younger ones with lower commissions does not support Plaintiff's claim of age discrimination. *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993) ("[T]here is no disparate

treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age."); *see also Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1125 (7th Cir. 1994) ("Wage discrimination is age discrimination only when wage depends directly on age, so that the use for one is a pretext for the other; high covariance is not sufficient.") (citation, internal quotation, and alterations omitted).

Second, Larson's statement of facts fails to present an issue of fact by which a reasonable jury could conclude any such statements were contemporaneous or causally related to his termination. *See Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1140 (7th Cir. 1997) (quoting *Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996)) ("'To be probative of discrimination, isolated comments must be contemporaneous with the discharge or causally related to the discharge decision-making process.'"). Indeed, only Austin's statement at the other dealership, which Plaintiff generally alleges occurred "[a]t about the same time," (LR 56.1(b)(3)(C) ¶ 23), even suggests it was contemporaneous to the termination. The other age-related statements made by Austin or Nelson were alleged either to be "ongoing" or made at particular meetings, the dates of which are unknown. In either case, a trier of fact would be entirely unable to determine that they were made contemporaneously to his firing.

Even if they were contemporaneous, Larson has offered no basis on which a jury could find that Austin's statements were causally related to his termination by Nelson. *See Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1140 (7th Cir. 1997)

17

(holding that "there is not even arguably a 'causal link'" between discriminatory comments and termination when the maker of the comments did not participate in the termination decision). Plaintiff has not argued or offered factual support for the notion that Austin either made the termination decision or influenced Nelson to make the decision, and therefore the argument is waived. *See Metzger v. Ill. State Police*, 519 F.3d 677, 681-82 (7th Cir. 2008). Moreover, as stated above, Plaintiff has failed to demonstrate that Nelson's stated reason for the termination was pretextual. Summary judgment must therefore be granted as to Plaintiff's ADEA claim.

C. **Family and Medical Leave Act**

Defendant moves for summary judgment on both of Plaintiff's claims under the FMLA, for interference and retaliation.

*1. Interference*

In order to prove FMLA interference, Larson must show: (1) he was eligible for the FMLA's protections; (2) Motor Werks was covered by the FMLA; (3) he was entitled to FMLA leave; (4) he provided Motor Werks with sufficient notice of his intent to take FMLA leave; and (5) Motor Werks denied him FMLA benefits to which he was entitled. *See Taylor-Novotny*, 772 F.3d at 498.

The only disputed issues are whether Larson provided Motor Werks with notice of his intent to take FMLA leave and whether he was denied FMLA benefits. Larson admits that he never requested time off for medical reasons under FMLA or otherwise, so he never tested whether any such requests would be granted. He also

18

admits that no one from Motor Werks discouraged him from taking leave. A plaintiff's admission that his employer never denied him an opportunity to take FMLA leave is "fatal" to an interference claim. *Id.* ("To prevail on an FMLA interference claim, an employee must show that her employer deprived her of an FMLA entitlement.") (citation and internal quotation omitted).

Larson's novel argument is that his firing interfered with his exercise of future rights to FMLA leave after the date of his termination. Larson suggests that his statements to Nelson that his heart was not beating right, that he would get tired, and that he may be unable to work twelve-hour days put Motor Werks on notice that he may intend to take FMLA leave. First, to the extent that Plaintiff is arguing that his statements to Nelson put Motor Werks on constructive notice of his intent to exercise his FMLA rights, the Court is unpersuaded. Telling an employer that a medical condition may make you "tired" and "unable to work twelve-hour days" cannot reasonably be interpreted as an intent to take time off of work entirely. Second, to prove interference, Larson must show he provided his employer with notice of his *intent* to take leave, not the *possibility* of the need for leave at some unspecified point in the future.

### 2. *Retaliation*

Plaintiff's complaint alleges that Motor Werks terminated him in retaliation "for his exercise of his rights under the [FMLA]." (Compl. ¶ 64.) Evidence supporting a claim of retaliatory discharge includes suspicious timing of the adverse employment action, evidence that similarly situated employees were treated

19

differently, and evidence that the employer offered a pretextual reason for the discharge. *Taylor-Novotny*, 772 F.3d at 495. As with his ADA discrimination claim, Larson has not demonstrated that the timing of the termination was suspicious, nor has he shown that any similarly situated employees were treated different or that the stated reason for the termination was pretextual. Moreover, his claim is a non sequitur, as he admits he did not exercise any FMLA rights for which Motor Werks could retaliate. Summary judgment is granted as to both counts of Plaintiff's complaint alleging violations of FMLA.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [Doc. No. 39, 51] is granted, and Defendant's Motion to Strike Plaintiff's Rule 56.1(b)(3) Statement of Additional Facts [Doc. No. 48] is denied as moot.

**SO ORDERED.**  **ENTERED:**

*/s/ Maria Valdez*

**DATE:   January 4, 2018**

**HON. MARIA VALDEZ**
**United States Magistrate Judge**